**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

SCULLY ROYALTY LTD.,

      Plaintiff,

    v.

SAMUEL STEFFEY MORROW,

      Defendant.

Case No. _____

## COMPLAINT

1. Plaintiff Scully Royalty Ltd. ("Plaintiff" or the "Company"), by and through undersigned counsel, alleges as follows against Defendant Samuel Morrow ("Defendant").

### NATURE OF ACTION

2. This action arises from Defendant's willful, self-interested misconduct as a former director and former officer of the Company, including his misappropriation of a company asset worth millions of dollars, his improper diversion of company resources for his personal enrichment in the form of post-termination compensation and expense reimbursements, his utter disregard of directives by the Company's Board of Directors and his refusal to relinquish control of the Company and its accounts after his removal as a director and officer, his interference with the transition to new management, his frustration of the Company's ability to complete its annual audit, and his wrongful denial of access to Company assets, accounts, systems, and records, all of which have caused harm to the Company and should result in substantial personal liability for Defendant.

3. Defendant was ousted from his position as a director of the Company by vote of shareholders representing a clear majority of the Company's outstanding shares at an annual

1

general meeting held on December 27, 2025 (the "Annual General Meeting").  The newly-elected board of directors (the "Board") subsequently terminated Defendant from his other positions with the Company and its subsidiaries after he refused to take any direction from the Board.

4.      At every turn, Defendant has refused to accept that the Company's shareholders voted not to reelect him as a director.  Instead, he has taken multiple efforts designed to thwart the will of the Company's shareholders.  Defendant's campaign to obstruct the newly-elected Board includes: (a) refusing to provide access to Company email, cloud storage, financial accounts, and enterprise tools; (b) refusing to deliver corporate records and devices; (c) refusing to recognize the properly-elected Board, including to issue false and misleading public communications that incorrectly stated that Defendant remained a director of the Company; (d) withholding Company funds and tangible property; and (e) interfering with the Company's contractual relationships and prospective business opportunities.

5.      Meanwhile, Defendant evaded an action that seeks to confirm the reality he faces: his personal loss of his directorship, officer, and employee positions with the Company and his inability to control and personally profit from Company assets.

6.      All of these actions have been taken with the personal, self-interested motive for Defendant to try to entrench himself in positions that he no longer holds, yet wrongfully grasps onto because he refuses to cede control of Company assets and accounts to the Board.  His personal actions are harming the Company and its shareholders by preventing management from effectively running its operations and causing a sense of confusion for third parties that places the Company in a state of limbo.

7.      Defendant's conduct violated federal law, including the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, the Stored Communications Act, 18 U.S.C. § 2701, and the Defend Trade

2

Secrets Act, 18 U.S.C. § 1836, the Massachusetts Uniform Trade Secrets Act, and constitutes conversion, tortious interference, breach of duty, and civil conspiracy under state common law.

## PARTIES

8.    Plaintiff Scully Royalty Ltd. is an exempt company organized under the laws of the Cayman Islands, and lists its executive offices as being in Shanghai, China.  Its shares trade on the New York Stock Exchange ("NYSE") under the symbol SRL.

9.    Defendant Samuel Morrow is a natural person residing in Massachusetts.  He served as a director and as Chief Executive Officer ("CEO"), President, and Chief Financial Officer of the Company.  He was removed from the Board at the Annual General Meeting held on December 27, 2025.  He was removed from all of his corporate titles by the Board and his employment with the Company and any of its subsidiaries was terminated on January 12, 2026 (the "Termination Date").  Upon information and belief, Defendant lives with his wife and family at their home at 154 Main Street, Groton, Massachusetts 01450.

## JURISDICTION AND VENUE

10.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, the Stored Communications Act, 18 U.S.C. § 2701, and the Defending Trade Secrets Act, 18 U.S.C. § 1836.

11.    This Court also has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and Defendant is a citizen of a different state than the Plaintiff.

12.    This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

13.    Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District and Defendant resides in this District.

14.    Personal jurisdiction over Defendant is proper because he resides in, transacts business in, and/or committed the acts alleged herein in this District, and he directed his conduct at the Company in this District.

## FACTUAL ALLEGATIONS

15.    Defendant served as a director of the Company for several years, until shareholders declined to re-elect him as a director and instead elected a replacement Board.  Defendant also served as CEO, President, and CFO of the Company for several years, until the Termination Date. In his prior positions, Defendant had access to and knowledge of the Company's systems, accounts, and assets.  As CEO, President, and CFO, Defendant managed and oversaw all day-to-day operations of the Company and personally had access to and/or oversight of all of the Company's key systems, accounts, and assets.

### December 2025 Annual General Meeting

16.    Late last year, the Company planned to hold an annual general meeting for shareholders.  On November 10, 2025, the Company filed on the Canadian SEDAR system a notice that such meeting would occur on December 27, 2025.

17.    On November 25, 2025, MILFAM LLC ("MILFAM"), a large shareholder of the Company, delivered a Shareholders Notice of Director Nomination ("MILFAM Nomination Notice") to the Company, indicating intent to nominate five individuals for election to the Company's board: Jerrod Freund, Mark Holliday, Alan Howe, Nimesh Patel, and Skyler Wichers.

18.     On December 5, 2025, the Company filed a copy of its proxy statement on the SEC's EDGAR system using Form 6-K, signed by Defendant as CEO and CFO.  Among other things, the proxy statement stated: "Pursuant to the amended and restated memorandum and articles of association of the Company, any additional director nominations for the Meeting must be received by the Company in compliance with any advance notice policy of the Company approved by the Board from time to time. As at the date hereof, no such nominations have been received by the Company."  This statement was false, as the Company had received the MILFAM Nomination Notice, as described above.

19.     Also on December 5, 2025, then-counsel for the Company wrote to MILFAM, asserting that the MILFAM Nomination Notice did not comply with timing requirements set out in the Company's Amended and Restated Memorandum and Articles of Association ("Memorandum and Articles").  MILFAM responded on December 7, 2025, disputing that conclusion.  The following day MILFAM sent its proxy statement to Company shareholders. Defendant caused the Company to repeat the false assertion about the MILFAM Nomination Notice in a press release issued December 12, 2025.

20.     On December 10, 2025, MILFAM filed an action in the Grand Court of Caymans, seeking a declaration that the MILFAM Nomination Notice met the timing requirements and was properly sent to the Company.  The court agreed to an expedited hearing, which occurred on December 19, 2025.  The Grand Court of Caymans issued an order in favor of MILFAM, finding that the MILFAM Nomination Notice "was validly delivered within the time period set out in, and in compliance with, the requirements as to timing" in the Memorandum and Articles.

21.     After losing before the Cayman Islands court, Defendant caused the Company to issue a press release on December 24, 2025, stating that the Company would appeal the decision

and that the planned Annual General Meeting would be "temporarily postponed for a short duration of time to allow a hearing before the Cayman Islands Court of Appeal to be heard as soon as practicable." No new date was provided for the meeting. To this date, Defendant has taken no steps to expedite or otherwise pursue that appeal.

22. On December 26, 2025, MILFAM issued a press release that explained that, pursuant to the governing law, the prior board and management could not postpone an Annual General Meeting and that, accordingly, MILFAM planned to attend the meeting as previously announced.

23. On December 27, 2025, the Annual General Meeting occurred. When the representative holding MILFAM's proxy arrived at the scheduled time and place, the doors to the meeting room were locked and there did not appear to be any representatives from the Company present. The MILFAM representative waited at least 15 minutes for anyone else to arrive and thereafter commenced the Annual General Meeting at the venue, just outside the locked doors. The representative held proxies sufficient to form a quorum. An independent tabular of election was present to record the proceedings. A vote was held on the election of directors whereby MILFAM's nominees were elected by shareholders holding 58.99 percent of the Company's outstanding shares. MILFAM announced the results of the election on December 29, 2025.

### Board Efforts to Assume Rightful Control of the Company

24. After the Annual General Meeting, the newly elected Board took immediate actions to take over management of the business and affairs of the Company and fulfill their responsibilities as members of the Board. At a Board meeting held on December 28, 2025, Mr. Wichers was appointed Chairman and the Board established new committee compositions.

25. On behalf of the newly-elected Board, Mr. Wichers wrote to Defendant on December 28, 2025, to request a meeting the following day to discuss an orderly transition and the continued operations of the Company. He asked that Defendant be prepared to discuss several topics, including bank and other accounts of the Company, removal of bank signatory authority by former directors, access to Company books and records, Company insurance policies, status of ongoing Company litigation, communication with Company employees and other stakeholders regarding the transition, and login credentials for the SEC's EDGAR filing system. Despite repeated follow-up communications, Defendant did not make any effort to arrange the requested meeting and did not respond to Mr. Wichers until January 2, 2026, as discussed below.

26. Instead, Defendant continued to direct Company counsel to take actions to obfuscate the Board.

27. On December 27, 2025, the Walkers law firm, representing MILFAM, wrote to AMRL Caymans Ltd. ("AMRL"), a law firm that had been representing the Company in earlier correspondence. Walkers informed AMRL of the results of the election at the Annual General Meeting, told AMRL that it would receive instructions on behalf of the Company in due course, and stated that any actions taken without instruction of the newly elected Board would be at the firm's own risk.

28. The following day, AMRL, purporting to still act on behalf of the Company, responded to Walkers disputing that the Annual General Meeting occurred or that the Board was elected. On information and belief, AMRL took direction from Defendant with respect to this letter.

29. Over the following few days (on December 29 and 31, 2025), Walkers responded to AMRL further reiterating that the Annual General Meeting occurred as noticed and that the

Board was elected by shareholders representing 58.99 percent of the Company's outstanding shares. Walkers directed AMRL to cease holding itself out as representing the Company given that it was not being directed by the Board. Walkers provided AMRL with legal precedent involving strikingly similar facts, whereby the court determined that absent an express provision in the articles of association, the directors of a limited company cannot postpone a general meeting of shareholders. Walkers further explained the need for urgent resolution of the dispute to protect the Company's interests and allow the Company to function by its Board.

**Defendant's Refusal to Cooperate with and Defiance of the Board**

30.     Defendant refused all requests from the Board and refused to provide it with access to any of the Company systems, accounts, and assets.

31.     Instead, Defendant utilized his access to Company accounts and assets, including its website and its login credentials to external websites such as EDGAR and SEDAR to issue statements, purportedly on behalf of the Company, that falsely claimed that the Annual General Meeting did not take place, that the Board was not elected, and that the former directors remained in place. None of these statements were authorized by the Board.

32.     In particular, on December 29, 2025, Defendant caused a press release to be issued in the name of the Company that asserted the Annual General Meeting was postponed, that the postponed meeting had not yet occurred, and that the board of directors remained unchanged. That press release was included as part of filings made on that same day to the SEC and to the Canadian Securities Administrators ("CSA"), filed using the Company's login credentials to the EDGAR and SEDAR systems, respectively. The Form 6-K filing made with the SEC was signed by Defendant.

33. Further, on December 31, 2025, Defendant caused the Company to file with the SEC a Form 6-K that purported to contain a copy of the Company's most recent financial report, for the six-month period ended June 30, 2025. The Form 6-K was signed purportedly on behalf of the Company by Defendant, identified as "duly authorized." The financial report stated that it was "approved by the Board of Directors and authorized for issue on December 31, 2025." No member of the Board signed or authorized the filing of the financial report or the Form 6-K.

34. The annual report contained detailed information regarding the Company's financial position. It also reiterated the statements made in the press release that Defendant caused to be issued on December 29, 2025, including that the postponed meeting had not yet taken place and that the prior board of directors remained in place.

35. On Friday, January 2, 2026, the Company's Board of Directors had a telephone conference with Defendant. During this telephone conference, Defendant did not acknowledge the Board's authority and did not provide any of the previously requested information. Mr. Wichers and Defendant discussed the need for Defendant to provide the Board with access to various information and records by the end of the upcoming weekend (*i.e.*, January 4, 2026). Mr. Wichers sent Defendant an email message after that telephone conference, memorializing the list of items discussed. Among other things identified were a list of employees, information about cash management systems including bank accounts, insurance policies, employment agreements, board materials, ongoing litigation, and key contracts and vendor relationships. This information is all necessary for the Board to ensure continued operation of the Company, an orderly transition, and to prevent or mitigate corporate harm.

36.     On January 4, 2026, Mr. Wichers wrote to Defendant, noting that none of the information had been provided and reminding that failure to comply by that day would force the Board to proceed with Defendant's termination for cause.

37.     Defendant did not provide any of the requested information by January 4, 2026, nor has he provided any of it as of the date of this filing.  Indeed, Defendant has refused to provide the Board with any corporate records, assets, or account access information.

**Termination of Defendant**

38.     Because of his repeated refusal to follow instructions from the Board and to instead engage in a public deception campaign to falsely claim that he remained a director of the Company and that the election of the Board was invalid, the Company, acting through its duly authorized Board and pursuant to the Company's governing documents and applicable law, removed Defendant from all positions and authority and terminated his employment with the Company and all of its subsidiaries on the Termination Date.  The Board announced that it would assume day-to-day operations of the Company while the search for a new CEO is underway.

39.     Mr. Wichers notified Defendant of his removal and termination on January 12, 2026, demanded return of all Company property, administrative credentials, devices, records, and funds, and directed him to facilitate a prompt and orderly transition.

**Defendant Continues to Disregard and Frustrate the Board's Authority**

40.     Defendant has utterly failed to address or acknowledge the vote of the shareholders and the subsequent decision of the Company's Board of Directors to terminate his employment. Indeed, despite the Termination Notice, Defendant has retained control of Company assets, refusing to surrender control as directed by the Board.  Among other things, Defendant has withheld credentials, and impeded the Board's access to Company systems, including but not

limited to: (a) corporate email and collaboration platforms; (b) cloud storage repositories; (c) financial and banking accounts; (d) financial regulator filing systems, including EDGAR and SEDAR; (e) accounts related to the Company's primary asset, *i.e.*, royalties deriving from an iron ore mine (the "Scully Mine"); and (f) accounts used to transmit company press releases.

41.    Defendant accessed at least some of the Company's protected computers and electronic communications systems after his authority had been revoked, without authorization or in excess of any remaining authorization, and obtained Company data and communications.  In particular and, on information and belief, among other systems, Defendant sent email messages from Company email accounts to third parties, purporting to act on behalf of the Company.

42.    Defendant refused to deliver tangible Company property, including laptops, mobile devices, external drives, security tokens, corporate seals, and original corporate records.

43.    Various third parties have notified members or representatives of the Board that Defendant, since his Termination Date, has continued to represent himself as still in control of the Company and to purport to act on behalf of the Company.  These third parties include management and counsel for the operator of the Scully Mine, other shareholders of the Company, and representatives from the Company's outside auditor.  Defendant has also reportedly instructed certain of these third parties not to communicate with the Board.

44.    On information and belief, Defendant has also served as a director and/or officer of certain subsidiaries of the Company.  The shareholdings of most of the Company's subsidiaries are non-public and span many corporate entities across several international jurisdictions. Specifically and among others, Plaintiff understands that Defendant was and continues to assert that he remains a director of 1128349 B.C. Ltd., a wholly-owned indirect subsidiary of the Company that holds the leasehold interest in the Scully Mine, and Merkanti Holdings p.l.c., a

11

wholly-owned (other than the Ordinary B Share described below) Maltese entity ("Merkanti Malta") that operates a bank ("Merkanti Bank").

45.     As a result of the Company's opaque corporate structure, along with Defendant's refusal to provide any information to the Board, on February 10, 2026, the Board passed resolutions removing Defendant from any and all director or officer positions from all of the Company's controlled subsidiaries.

46.     Defendant has caused 1128349 B.C. Ltd. to take steps on behalf of that entity, without any direction from the Board and in a manner designed to divert Company property away from control of the Board.  For example, on January 27, 2026, Defendant signed a Notice of Default on behalf of 1128349 B.C. Ltd. issued to the operator of the Scully Mine, seeking to force it to make a royalty payment to a bank account that Defendant controls and to which he has refused to provide access for the Board.  Defendant has also engaged counsel (Stewart & McKelvey) on behalf of 1128349 B.C. Ltd., at its expense.

47.     Indeed, on December 13, 2025—mere days before the AGM—Defendant contacted the operator of the Scully Mine to provide updated bank account information and directed it to send all future payments to that account.  The Board has no knowledge of this bank account and Defendant has not provided access to it.

48.     Stewart & McKelvey, on behalf of 11238349 B.C. Ltd. and acting on direction from Defendant, filed court papers in Canada seeking to cause the operator of the Scully Mine to make a royalty payment into that new and previously undisclosed bank account that Defendant controls.

49.     Merkanti Malta has a book value in the tens of millions of Euros.  All of the Class A shares are held, directly or indirectly, by the Company.  On information and belief, a few years ago, one Ordinary B share of Merkanti Malta was granted to another Company subsidiary in order

to allow Merkanti Malta to comply with Maltese law regarding the number of shareholders required of public companies. By virtue of the articles of association of Merkanti Malta, this Ordinary B share purportedly vests in the holder the right to approve certain governance matters, including removal or appointment of directors of Merkanti Malta. As such, the holder of this Ordinary B share has apparent unilateral authority to control the corporate governance—and with it, the business and affairs—of the Merkanti Malta entity.

50.    Upon information and belief, in or around September 2023 this Ordinary B share was transferred to Defendant, a director of Merkanti Malta, for nominal consideration in a self-interested transaction, in violation of law. That self-interested transfer, which on information and belief effectively enriched Defendant in an amount equal to tens of millions of Euros, was never disclosed in any of the Company's public filings. In fact, Defendant signed and caused the Company to issue an annual report that represented that: "As at December 31, 2024, none of the non-controlling interests are material to the Group. As at December 31, 2024, there were no significant restrictions (statutory, contractual and regulatory restrictions, including protective rights of non-controlling interests) on Scully's ability to access or use the assets and settle the liabilities of the Group except for amounts presented as restricted cash." Defendant knew that such statements were false, as he had just improperly taken from the Company this Ordinary B share and the outsized corporate governance authority that came with it.

51.    Defendant has also engaged several law firms as legal counsel that purport to act on his own personal behalf, including Latham & Watkins and Broadhurst LLC. Defendant stated in an email message that the Latham & Watkins retainer on its own exceeded $1 million. On information and belief, Defendant has caused the Company to pay these amounts and to reimburse or commit to pay for the services performed by these law firms. Such expenditures were not

authorized by the Board and constitute waste of assets for which Defendant will be personally responsible.

**Defendant Evades Service in Cayman Islands Litigation**

52.     MILFAM and representatives of the Board filed litigation in the Grand Court of the Cayman Islands on January 5, 2026, seeking declaratory relief as to whether the Annual General Meeting was validly held and whether the MILFAM nominees were elected to the Board.  Mr. Wichers sent a copy of the court documents to Defendant via email.

53.     For months, Defendant repeatedly refused to accept service of court papers in that case or to otherwise facilitate a final judicial determination of whether the Annual General Meeting was validly held and who properly comprises the current Board.  At the same time, he accepted service in the interpleader action in Canada that will decide whether the Scully Mine operator must pay the royalty into the bank account that Defendant controls.  He also participated in a deposition in that action, ostensibly from Shanghai, and refused on the record to accept service of the Cayman Islands proceeding.

54.     On March 20, 2026, counsel for MILFAM learned that Defendant filed an acknowledgement of service in the Cayman Islands case, which only occurred after his co-defendant was served and after it was made clear to him that MILFAM would proceed with the court case irrespective of his appearance.

55.     Defendant's continued and repeated efforts to hold onto control of Company assets and accounts, hold himself out to third parties as a director and officer of the Company and its subsidiaries, and refusal to facilitate an orderly transition to new management despite an overwhelming majority vote of outstanding shares, is solely designed for his personal enrichment and entrenchment.  If, as he claims, he remained a director and officer of the Company, he would

14

owe fiduciary duties to it and its shareholders. His efforts to evade service in a Cayman Islands court proceeding designed to resolve who the proper Board is of this Cayman Islands company were fundamentally inconsistent with a good faith exercise of such fiduciary duties. To the contrary, his actions harmed the Company and its shareholders by hindering its operations and causing a sense of confusion for third parties.

### Damages

56.    As a direct and proximate result of Defendant's conduct, the Company has suffered damages including expenses for counsel hired to address Defendant's actions; costs incurred with trying to gain access to Company accounts and assets; other professional and vendor fees; reputational harm; damages resulting from an expected delayed audit opinion (which, among other things, could precipitate the delisting of Company securities from the NYSE); damages resulting from an inability of the Company to effectively and timely address material ongoing litigation; damages associated with any salary and other benefits paid to or on behalf of Defendant after his termination by the Board; expenses for counsel Defendant retained and arranged for the Company to pay or reimburse; and delayed or loss of use of funds and property, including the Merkanti Malta entity, in an amount to be proven at trial.

57.    The Company's annual audit is targeted for completion by April 30, 2026. Completion of the audit is necessary in order for the Company to maintain its listing on the NYSE. In order to meet the deadline for the audit, the outside auditing firm ordinarily needs several months to review company finances and other documents and to interface with members of management. To that end, the Board directed the Company's existing outside auditing firm to begin its work. The auditing firm has communicated to the Board that is prepared to move forward notwithstanding Defendant's refusal to acknowledge the change in control, provided that the old

board also agree to retain the auditor on a without-prejudice basis.  The Board agreed with that approach, to make sure that the Company would meet its targeted audit deadline.  But, to the Board's knowledge, Defendant has not responded to this proposal from the outside auditor, for over seven weeks.  Accordingly, to Plaintiff's knowledge, the auditing firm has been unable to proceed with the audit, which significantly jeopardizes the ability of the audit to be completed by the deadline and therefore creates substantial risk that the Company may not be able to maintain its listing on the NYSE.

58.    The Board has retained counsel to assist with effectuating the transition from former management to new management and to deal with the many efforts by Defendant to thwart an orderly transition.  This includes legal expenses incurred in connection with multiple court actions, including the present one and proceedings in the Cayman Islands, and in communications with Defendant to try to obtain access to Company accounts and assets.  It also includes legal expenses incurred in the interpleader action filed in Canada with respect to a Scully Mine royalty payment.  To date, these expenses total in the hundreds of thousands of dollars.

59.    As of the most recent annual report filed by the Company, Defendant was paid a salary of $532,694 and other compensation totaling $330,347, comprised of housing allowances, expense reimbursement, and retirement benefits.  On information and belief, Defendant did not stop these payments after receiving his notice of termination from the Board.

60.    Defendant acted willfully and maliciously, knowing he lacked authority after the Termination Date, and with the intent to coerce the Board to agree that he remained a director and officer, to extract concessions, and/or to obtain personal advantage at the Company's expense.

16

61.     Upon information and belief, Defendant coordinated with one or more other persons, including former Director Michael Smith, to maintain control of accounts, to frustrate the Board's operations, and to interfere with the Company's business relationships.

## COUNT I
**(Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C))**

62.     Plaintiff realleges and incorporates by reference the above paragraphs as though fully set forth herein.

63.     The Company operates "protected computers" used in and affecting interstate or foreign commerce, including servers, laptops, cloud-hosted systems, and accounts.

64.     After the Termination Date, Defendant intentionally accessed protected computers without authorization and/or exceeded authorized access and thereby obtained information from such protected computers.

65.     Defendant's conduct caused loss to Plaintiff aggregating at least $5,000 in costs, with costs continuing to accrue, including the reasonable cost of responding to the offense, conducting a damages assessment, and taking steps to procure access to Company data, programs, systems, and information.

66.     As a direct and proximate result, the Company suffered damage and loss and is entitled to compensatory damages, injunctive relief, and other relief authorized by 18 U.S.C. § 1030 in an amount to be proven at trial.

## COUNT II
**(Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4))**

67.     Plaintiff realleges and incorporates by reference the above paragraphs as though fully set forth herein.

68.     The Company operates "protected computers" used in and affecting interstate or foreign commerce, including servers, laptops, cloud-hosted systems, and accounts.

69.     After the Termination Date, Defendant knowingly and with intent to defraud accessed protected computers and, by means of such conduct, furthered a scheme to defraud and obtained something of value, including Company data and control over accounts.

70.     Defendant's conduct caused loss to Plaintiff aggregating at least $5,000 in costs, with costs continuing to accrue, including the reasonable cost of responding to the offense, conducting a damage assessment, and taking steps to procure access to Company data, programs, systems, and information.

71.     As a direct and proximate result, the Company suffered damage and loss and is entitled to compensatory damages, injunctive relief, and other relief authorized by 18 U.S.C. § 1030 in an amount to be proven at trial.

### COUNT III
**(Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5))**

72.     Plaintiff realleges and incorporates by reference the above paragraphs as though fully set forth herein.

73.     The Company operates "protected computers" used in and affecting interstate or foreign commerce, including servers, laptops, cloud-hosted systems, and accounts.

74.     After the Termination Date, Defendant intentionally accessed protected computers without authorization and caused damage to the Company by impairing availability of data, programs, systems, and information.

75.     Defendant's conduct caused loss to the Company aggregating at least $5,000 in costs, with costs continuing to accrue, including the reasonable cost of responding to the offense,

conducting a damage assessment, and taking steps to procure access to Company data, programs, systems, and information.

76.     As a direct and proximate result, the Company suffered damage and loss and is entitled to compensatory damages, injunctive relief, and other relief authorized by 18 U.S.C. § 1030 in an amount to be proven at trial.

**COUNT IV**
**(Violation of the Stored Communications Act, 18 U.S.C. § 2701(a))**

77.     Plaintiff realleges and incorporates by reference the above paragraphs as though fully set forth herein.

78.     The Company's email systems, collaboration platforms, and cloud storage contain electronic communications in electronic storage on facilities through which electronic communication services are provided.

79.     After the Termination Date, Defendant intentionally accessed without authorization, or intentionally exceeded an authorization to access, such facilities and obtained, prevented authorized access to, and/or deleted electronic communications while in electronic storage.

80.     Defendant's conduct was willful and knowing and not authorized by the Company.

81.     As a direct and proximate result, the Company suffered actual damages, including economic losses and costs of remediation in an amount to be proven at trial.  The Company is entitled to appropriate relief, including equitable relief and damages authorized by 18 U.S.C. § 2707.

## COUNT V
### (Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836)

82. Plaintiff realleges and incorporates by reference the above paragraphs as though fully set forth herein.

83. The Company's records, including its electronic communication systems, financial records, employment agreements, board materials, and key vendor relationships contain and/or constitute trade secrets owned by the Company and relate to products and services utilized in interstate and/or foreign commerce.

84. Defendant misappropriated such trade secrets by using such trade secrets without the express or implied consent of the Company, as managed by the Board, and knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret.

85. On information and belief, the trade secrets were willfully and maliciously misappropriated by Defendant, because he knew that he was acting without authorization of the Board at the time that he misappropriated the trade secrets, and acted in a concerted manner to prevent the Board from managing the Company.

86. As a direct and proximate cause, Plaintiff has suffered damages in an amount to be proven at trial.

## COUNT VI
### (Conversion)

87. Plaintiff realleges and incorporates by reference the above paragraphs as though fully set forth herein.

88. The Company, and the Board as the Company's lawfully-appointed managers, own or have the right to possess specific personal property, including funds in identified accounts,

20

tangible devices, security tokens, original corporate records, and digital assets, including accounts and data.

89.     Defendant wrongfully exercised dominion and control over such property in denial of, or inconsistent with, Plaintiff's rights, by refusing to relinquish control and by withholding, diverting, or misappropriating the property, including by causing the Company to spend resources despite not having authority to do so.

90.     Plaintiff has been harmed by Defendant's conversion and is entitled to the return of the property or its value, together with damages for loss of use in an amount to be proven at trial.

## COUNT VII
### (Civil Conspiracy)

91.     Plaintiff realleges and incorporates by reference the above paragraphs as though fully set forth herein.

92.     Defendant entered into an agreement or tacit understanding with one or more persons, including former director Michael Smith, to engage in unlawful acts or lawful acts by unlawful means, including the unauthorized access, conversion, and interference alleged herein.

93.     In furtherance of the conspiracy, one or more overt acts were committed, including withholding property and communicating false statements of authority to third parties.

94.     The conspiracy proximately caused damages to the Company as alleged herein.

## COUNT VIII
### (Tortious Interference with Contract)

95.     Plaintiff realleges and incorporates by reference the above paragraphs as though fully set forth herein.

96.     The Company has valid contracts with employees, vendors, and customers, including the operator of the Scully Mine and the Company's outside auditor, and reasonable

21

expectancies of prospective business relations with identified customers and partners. The Company is also involved in ongoing litigation, for which claims have been asserted against it and for which the Company has asserted claims for recovery.

97. Defendant knew of these contracts and expectancies through his former roles and access to corporate records.

98. Defendant intentionally and improperly interfered by falsely representing that he retained authority, making public statements for third parties to disregard the Board, and obstructing communications.

99. Defendant's interference caused breaches, disruptions, delays, and/or the failure of prospective relations to materialize, resulting in damages to the Company, including lost revenue and increased costs.

100. As a direct and proximate result, Plaintiff has suffered damages in an amount to be proven at trial.

## COUNT IX
### (Intentional Interference with Advantageous Business Relations)

101. Plaintiff realleges and incorporates by reference the above paragraphs as though fully set forth herein.

102. The Company has valid contracts with employees, vendors, and customers, including the operator of the Scully Mine and the Company's outside auditor, and reasonable expectancies of prospective business relations with identified customers and partners. The Company is also involved in ongoing litigation, for which claims have been asserted against it and for which the Company has asserted claims for recovery.

103. Defendant knew of these contracts and expectancies through his former roles and access to corporate records.

104.    Defendant intentionally and improperly interfered by falsely representing that he retained authority, making public statements for third parties to disregard the Board, and obstructing communications.

105.    Defendant's interference caused breaches, disruptions, delays, and/or the failure of prospective relations to materialize, resulting in damages to the Company, including lost revenue and increased costs.

106.    As a direct and proximate result, Plaintiff has suffered damages in an amount to be proven at trial.

**COUNT X**
**(Breach of Duty of Loyalty)**

107.    Plaintiff realleges and incorporates by reference the above paragraphs as though fully set forth herein.

108.    During Defendant's employment as CEO, CFO, and director and/or officer of subsidiaries of the Company, Defendant owed a duty of loyalty to the Company, among other things, refrain from self-dealing or taking advantage of corporate opportunities for personal gain. These duties continued after Defendant's relationship with the Company ended.

109.    Defendant breached his duty of loyalty by, among other things (1) misappropriating, disclosing, and/or using the Company's confidential information to divert business opportunities and property away from control of the Board, (2) engaging in an unauthorized and undisclosed scheme to force Scully Mine to make a royalty payment to a bank account controlled by the Defendant, and (3) receiving a transfer of one Ordinary B share of Merkanti Malta for less than fair consideration in a self-interested transaction, in violation of law.

110.    As a direct and proximate result, Plaintiff has suffered damages in an amount to be proven at trial.

## COUNT XI
### (Violation of Massachusetts Uniform Trade Secret Act M.G.L. ch. 93 §42A)

111.    Plaintiff realleges and incorporates by reference the above paragraphs as though fully set forth herein.

112.    The Company's records, including its electronic communication systems, financial records, employment agreements, board materials, and key vendor relationships contain and/or constitute trade secrets owned by the Company and relate to products and services utilized in interstate and/or foreign commerce.

113.    Defendant misappropriated such trade secrets by using such trade secrets without the express or implied consent of the Company, as managed by the Board, and knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret.

114.    The trade secrets were willfully and maliciously misappropriated by Defendant because he knew that he was acting without authorization of the Board at the time that he misappropriated the trade secrets and acted in a concerted manner to prevent the Board from managing the Company.

115.    As a direct and proximate result, Plaintiff has suffered damages in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in their favor and against Defendant and award the following relief:

a)    Compensatory damages in an amount to be proven at trial;

b)    Restitution and disgorgement of monies and property wrongfully obtained or withheld;

c)        Injunctive relief requiring Defendant to immediately: (i) return all Company property; (ii) transfer and disclose all administrative credentials; (iii) provide access to the Board for all Company systems and accounts; (iv) cease accessing Company systems and accounts; and (v) refrain from holding himself out as a director, officer, or authorized representative of the Company;

d)        Declaratory relief that Defendant has no authority or role with the Company as of the Removal Date and that the Board is duly authorized to control all Company assets, accounts, and records;

e)        Exemplary or punitive damages to the extent permitted by law for willful and malicious conduct;

f)        Costs of suit, including reasonable attorneys' fees and expert fees where permitted by law, including under 18 U.S.C. § 1030, 18 U.S.C. § 2707, and 18 U.S.C. § 1836;

g)        Pre-judgment and post-judgment interest as permitted by law; and

h)        Such other and further relief as the Court deems just and proper.

Respectfully submitted,

SCULLY ROYALTY LTD.,

By its attorneys,

*/s/ Dana A. Zakarian*
Dana A. Zakarian (BBO No. 641058)
Robert L. Boston (BBO No. 665174)
Smith Duggan Cornell & Gollub LLP
55 Old Bedford Road
Lincoln, MA 01773
(617) 228-4400
dana.zakarian@smithduggan.com
robert.boston@smithduggan.com

Dated:  March 20, 2026