**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| SCULLY ROYALTY LTD., | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) Civil Action No. 1:26-cv-11373-RGS |
| v. | ) |
|  | ) |
| SAMUEL S. MORROW, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

**DEFENDANT SAMUEL S. MORROW'S MEMORANDUM OF LAW**
**IN SUPPORT OF HIS MOTION TO DISMISS**

Defendant Samuel S. Morrow ("Morrow") respectfully submits this Memorandum of

Law in Support of his Motion to Dismiss the Complaint. Plaintiff Scully Royalty Ltd.'s claims

are not ripe for adjudication, this Court lacks jurisdiction over Morrow, and the claims fail to

state a claim upon which relief can be granted.

**Background**

Plaintiff Scully Royalty Ltd. ("Plaintiff" or the "Company") is a Cayman Islands

company with executive offices in Shanghai, China. Compl., ¶ 8. Morrow has held several

positions at the Company including CEO, President, CFO and member of the Board of Directors

(the "Board"). *Id.*, ¶ 9. In his official capacity, Morrow had authorized access to and oversight of

the Company's systems, accounts, and assets. *Id.*, ¶ 15. On November 25, 2025, MILFAM LLC,

a shareholder of the Company, delivered a Shareholders Notice of Director Nomination to the

Company, stating its intent to nominate new directors. *Id.*, ¶ 17. A dispute arose over whether the

nomination notice and the subsequent election complied with the Company's governing

documents. *Id.*, ¶ 19. On December 24, 2025, the Company issued a notice that the planned

Annual General Meeting ("AGM") would be postponed. *Id.*, ¶ 21.

On December 27, 2025, MILFAM purportedly held the AGM without any Company representative present and elected its slate of directors (the "new Board"). *Id.*, ¶ 23. The new Board purportedly appointed Skylar Wichers ("Wichers") as its chairman. *Id.*, ¶ 24. The validity of the AGM and new Board are the subject of active litigation in the Grand Court of the Cayman Islands. *Id.*, ¶ 55. On January 12, 2026 (the "Termination Date"), the new Board purported to terminate Morrow from all positions with the Company and its subsidiaries. *Id.*, ¶ 9. On that same date, Wichers notified Morrow that he had been terminated from all positions within the Company and its subsidiaries and demanded return of "all Company property, administrative credentials, devices, records, and funds" and directed Morrow to facilitate an orderly transition. *Id.*, ¶¶ 9, 39. On February 10, 2026, the new Board passed a resolution removing Morrow from any director or officer position of any Company-controlled subsidiary. *Id.*, ¶ 45.

The specific conduct underlying most of Plaintiff's claims occurred before January 12, 2026, during the period when Morrow was the Company's CEO. *See id.*, ¶¶ 21, 32-33, 46-47, 50. Between December 27 and January 12, Morrow continued to direct Company operations, including initiating the filing of certain documents with the Securities and Exchange Commission's EDGAR system and with the Canadian SEDAR system, issuing press releases, and communicating with counsel. *Id.*, ¶¶ 31-37. On December 13, 2025, weeks before the Termination Date, Morrow contacted the operator of the Scully Mine[1] to provide updated bank account information. *Id.*, ¶ 47. On January 27, 2026, Morrow signed a Notice of Default on behalf of 1128349 B.C. Ltd., a subsidiary of which he remained a director. *Id.*, ¶ 46.

---

[1] The Scully Mine, an iron ore mine in Canada, is Plaintiff's primary asset. Compl., ¶ 40.

Plaintiff now brings this eleven-count Complaint alleging that Morrow refused to relinquish control of Company systems, accounts, and assets in violation of the Computer Fraud and Abuse Act ("CFAA"), the Stored Communications Act ("SCA"), and the Defend Trade Secrets Act ("DTSA"), and state law claims for conversion, civil conspiracy, tortious interference with contract, intentional interference with advantageous business relations, breach of duty of loyalty, and misappropriation of trade secrets under the Massachusetts Uniform Trade Secrets Act ("MUTSA"). *Id.*, ¶ 7.

<u>**Argument**</u>

## I.    PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BECAUSE THEY ARE NOT RIPE

Before reaching the merits, the Court must resolve a threshold question: Was the new Board validly elected at the AGM, and did it have the power to terminate Morrow? The ripeness doctrine is to "prevent the courts…from entangling themselves in abstract disagreements" and requires that a dispute be sufficiently concrete and final before judicial resolution is appropriate. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). A claim is not ripe "when it involves a chain of speculation or contingencies." *Narrigan v. Goldberg*, 170 F. 4th 14, 19 (1st Cir. 2026)(citation omitted). Courts evaluate ripeness by asking whether there is a sufficiently live case or controversy and whether withholding a decision would cause harm to the party seeking relief. *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017).

Plaintiff's claims flow from actions purportedly taken by the new Board but Plaintiff concedes that there is an ongoing "Cayman Islands court proceeding designed to resolve who the proper Board is of this Cayman Islands company." Compl., ¶ 55. Because that question has not yet been resolved (Plaintiff does not allege that it has), there is no way to know whether the new Board had any authority and, therefore, no concrete, justiciable dispute for this Court to resolve.

*See Ramos v. Banks*, No. 24 Civ. 5109, 2025 WL 1455703, at *4 (S.D.N.Y. May 21, 2025)(claims unripe where relevant questions regarding nature and scope of payments were still being contested). Further, there is no harm in deferring Plaintiff's claims as Plaintiff would be free to refile once the threshold question is resolved. Proceeding on the merits now would require this Court to assume the validity of the new Board and would result in an advisory opinion or a decision that could conflict with a decision of the Court of Grand Cayman or any subsequent Court of Appeal's decision. Plaintiff's claims should thus be dismissed as unripe.[2] *See Reddy*, 845 F.3d at 505 (dismissing claims without prejudice because dispute was not ripe).

## II.    PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION

When considering a Fed. R. Civ. Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction the Court takes "the facts from the pleadings and whatever supplemental filings are contained in the record, giving credence to the plaintiff's version of genuinely contested facts." *Harnish v. Crook*, No. 17-11744, 2018 WL 1833040, at *1 (D. Mass. Apr. 17, 2018)(citation omitted). Personal jurisdiction can be either general or specific. *SV Athena, LLC v. B&G Mgmt Servs., LLC*, 671 F. Supp. 3d 77, 81 (D. Mass. 2023). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Beck v. Bronstein*, No. 23-cv-10416, 2023 WL 5833116, at *11 (D. Mass. Sept. 8, 2023), *citing Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). The Court has specific jurisdiction over a defendant "where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." *SV Athena, LLC*, 671 F. Supp. 3d at 81 (citation omitted). "Plaintiff bears the

---

[2] In the alternative, should the Court decline to dismiss, Defendant respectfully submits that the Court may, in its discretion, stay this action pending resolution of the Cayman Islands proceeding. *See Gray v. Arrow Mut. Liability Ins. Co.,*  No. 25-10054, 2025 WL 3033882, at *3 (D. Mass. Oct. 29, 2025).

burden of establishing personal jurisdiction." *Id.*

### A. The Court does not have general jurisdiction over Morrow.

Plaintiff's jurisdictional allegations are conclusory. *See World Depot Corp. v. Onofri*, No. 16-12439, 2017 WL 6003052, at *7 (D. Mass. Dec. 4, 2017)(citation omitted)("A plaintiff may not "rely on unsupported allegations in [its] pleadings"). Plaintiff alleges that Morrow "is a natural person residing in Massachusetts" and that he "lives with his wife and family" in Massachusetts. Compl, ¶ 9. Those allegations are inaccurate and refuted by Morrow's affidavit ("Aff.") filed herewith. Morrow was *formerly* a resident of the Commonwealth between 2020 and 2023. Aff., ¶ 4. In April 2023, as part of his role as an officer of the Plaintiff, Morrow moved with his family to Shanghai. Aff., ¶ 6. Plaintiff cannot now in good faith contend that Morrow is a Massachusetts domiciliary given that it was Plaintiff who required Morrow to relocate to Shanghai. Plaintiff knows full well that Morrow is domiciled in China and should not be able to claim otherwise in order to manufacture jurisdiction in Massachusetts.

At the time the Complaint was filed, Morrow was a resident of Shanghai, China and had no intention of leaving. Aff., ¶¶ 6, 12. See *Maysonet-Robles v. Cabrero,* 323 F.3d 43, 49 (1st Cir.2003)("time of filing" rule provides that "federal jurisdiction attaches at the time when the action is commenced and cannot be ousted by later developments"). Prior residency alone is insufficient to establish domicile or render an individual "at home" for purposes of general jurisdiction. *Lynch v. Weber-Stephen Products, LLC*, 2026 WL 923739, at *3 (E.D.N.Y. Apr. 6, 2026), *citing Van Buskirk v. United Grp. of Companies, Inc.*, 935 F.3d 49, (2d. Cir. 2019). Further, the Complaint itself alludes to Morrow's residence in Shanghai. Compl., ¶ 53. Accordingly, Plaintiff has not alleged sufficient facts to support the exercise of general jurisdiction over Morrow. *See Zhang v. Bettencourt*, 519 F. Supp. 3d 78, 79 (D. Mass.

2021)(citation omitted)(where a motion to dismiss advances a factual challenge to the accuracy of jurisdictional facts, the nonmoving party's allegations are "entitled to no presumptive weight").

### B. The Court does not have specific jurisdiction over Morrow

Courts consider three factors when analyzing specific jurisdiction: does the claim arise out of or relate to the defendant's forum state activities, did the defendant purposefully avail himself of the forum state making jurisdiction foreseeable, and is the exercise of jurisdiction reasonable. *B2 Opp. Fund LLC v. Trabelsi*, No. 17-10043, 2017 WL 3707383, at *4 (D. Mass. Aug. 28, 2017)(citation omitted). None of the claims asserted by the Plaintiff allege that any conduct giving rise to this action took place in Massachusetts or arose from any contact Morrow may have had with the Commonwealth. The Complaint contains only a bare, conclusory allegation, without any specific conduct, that Morrow "transacts business in, and/or committed the acts alleged herein in this District, and he directed his conduct at the Company in this District." Compl., ¶ 14. Plaintiff's **<u>only</u>** factual allegation concerning Morrow's location states that he participated in a deposition from Shanghai, China. *Id.*, ¶ 53. Because Plaintiff cannot establish that this action arises from or is related to any Massachusetts-directed activity by Morrow, this Court lacks specific personal jurisdiction over Morrow. *See B2 Opp. Fund LLC*, 2017 WL 3707383, at *6 (dismissing complaint for lack of jurisdiction because awareness of a party's presence in a forum "[was] not, on its own, enough to create personal jurisdiction over a defendant")(citation omitted).

Furthermore, Plaintiff alleges no facts showing that Morrow purposefully availed himself of the privilege of conducting activities in Massachusetts. The cornerstones of the purposeful availment inquiry are voluntariness and foreseeability. *Back Bay Farm, LLC v. Collucio*, 230 F. Supp. 2d 176, 186 (D. Mass. 2002). Morrow was employed by the Company as its CEO.

However, Morrow could not possibly have foreseen that he would be subject to litigation in Massachusetts when he is domiciled in China and the Plaintiff is a Cayman Islands company. The Plaintiff is a company organized in the Cayman Islands, and there are no facts alleging that the claims arise from any contact Morrow had with Massachusetts. *See B2 Opp. Fund LLC*, 2017 WL 3707383, at *6 (wiring of money to Massachusetts bank account and corresponding with party located in Massachusetts insufficient to satisfy foreseeability prong of purposeful availment inquiry). None of the other companies Plaintiff alleges Morrow controlled have ties to Massachusetts and there are no allegations that Morrow transacted any business with those firms in Massachusetts.[3]

Lastly, asserting jurisdiction over Morrow would not be reasonable. The Court looks to the "Gestalt factors" to determine reasonableness:

> 1) the defendant's burden of appearing, 2) the forum state's interest in adjudicating the dispute, 3) the plaintiff's interest in obtaining convenient and effective relief, 4) the judicial system's interest in obtaining the most effective resolution of the controversy and 5) the common interests of all sovereigns in promoting substantive social policies.

*Martha's Vineyard Scuba Headquarters, Inc. v. McCluskie*, 922 F. Supp. 2d 150, 156 (D. Mass. 2013). Morrow is a resident and domiciliary of China. Aff. ¶¶ 6, 9-12. Not only would it be burdensome for Morrow to litigate this matter in Massachusetts, but the Commonwealth has no

---

[3] This Court may take judicial notice of geographic facts. *K.O. by and through E.O. v. United States*, 651 F. Supp. 3d 331, 339 n.2 (D. Mass. 2023)(citation omitted). Plaintiff alleges that AMRL Caymans Ltd. law firm, the Scully Mine, Merkanti Holdings p.l.c., 1128349 B.C. Ltd., and Stewart & McKelvey are companies Morrow either directed to take action on his behalf or exerted control over. Compl., ¶¶ 27-28, 44, 46, 48. AMRL Caymans Ltd. is a law firm located in the Cayman Islands. *See* https://amrlcayman.com/contact/. Scully Royalty Ltd.'s website reflects that the Scully Mine is located in Canada. *See* https://www.scullyroyalty.com/. Merkanti Holdings p.l.c. is a Maltese company. Compl. ¶ 44. 1128349 B.C. Ltd. is a Canadian corporation listed on the Canadian Business Registry and has a registered office in Vancouver, British Columbia. *See* https://ised-isde.canada.ca/cbr-rec/results?q=1128349+B.C.+Ltd. Stewart & McKelvey is a Canadian law firm. *See* https://stewartmckelvey.com/.

interest in the matter because there is no nexus between the claims and Massachusetts. *See Martha's Vineyard*, 922 F. Supp. 2d at 156 (dismissing claims where injury occurred outside Massachusetts and effect not felt by Massachusetts). Further, the Plaintiff may seek relief in another forum that would have jurisdiction over this matter such as China, where Morrow is domiciled and the Company maintains its headquarters, or in the Cayman Islands where the Company is organized and is currently involved in litigation. Compl., ¶ 8. The Complaint should be dismissed for lack of personal jurisdiction over Morrow.

III.    **PLAINTIFF'S FEDERAL CLAIMS (COUNTS I-V) FAIL TO STATE A CLAIM**

    **A.  Plaintiff fails to state a claim for violation of the CFAA (Counts I-III)**

The CFAA imposes liability where a defendant "accesses a computer 'without authorization[] or exceeds authorized access;' (2) commits an act prohibited under the CFAA; and (3) causes a loss aggregating at least $5,000 in value during a 1-year period." *Premier Shield Ins., LLC v. Afternic Services, LLC*, No. 22-40068, 2022 WL 17541797, at *2 (D. Mass. Dec. 8, 2022), *citing* 18 U.S.C. § 1030. The terms "without authorization" and "exceeds authorized access," §§ 1030(a)(2)(C), (a)(4) and (a)(5), concern whether an individual accessed information that was off limits to them, not whether they later used information for an allegedly improper purpose. *Van Buren v. United States*, 593 U.S. 374, 383-89 (2021). The CFAA draws a line between those who enter areas of a computer system that are closed to them and those who misuse information they were otherwise permitted to access. *Id.* at 389.

Plaintiff does not plausibly allege that Morrow accessed any computer "without authorization" or in a manner that "exceed[ed] authorized access." Plaintiff alleges that Morrow accessed protected computers and electronic communications systems after his authority had been revoked and "sent email messages from Company email accounts to third parties." Compl., ¶¶ 41, 64, 69, 74. However, all specified dates of Morrow's conduct pre-date the Termination

8

Date and occurred when Morrow remained CEO. *See e.g.*, Compl., ¶¶ 31-33, 39. Plaintiff's bare assertions are insufficient to sustain a claim under the CFAA. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

As this Court has stated, the CFAA applies to those who "obtain information from particular areas in the computer—such as files, folders, or databases—to which their computer access does not extend." *Welter v. Medical Prof. Mut. Ins. Co.*, No. 22-cv-11047, 2023 WL 2988627, at *7 (D. Mass. Feb. 23, 2023), *citing Van Buren*, 593 U.S. at 378. Plaintiff fails to describe any steps that were taken to restrict or disable Morrow's login credentials or make the computer systems off limits. Plaintiff does not claim to have notified any third-party service provider, including whatever platform hosts Company email, EDGAR credentials, or SEDAR credentials, to revoke Morrow's access. In fact, Plaintiff admits that Morrow's credentials remained active and the systems continued to accept his logins, as demonstrated by his continued ability to send emails. Compl., ¶ 41. A system that accepts a user's credentials and grants entry has not revoked or restricted access in any meaningful sense. Plaintiff cannot simultaneously allege that Morrow violated the CFAA by obtaining information without access while simultaneously admitting that he continued to log in successfully without any technical barriers. *See Welter*, 2023 WL 2988627, at *7-8 (where employee used his password to access computer systems, such access insufficient to support CFAA claim).

### B. Plaintiff fails to state a claim for violation of the SCA (Count IV)

The SCA prohibits an individual from intentionally accessing a facility that provides an electronic communication service without authorization or exceeding an authorization to access that facility and thereby obtaining, altering or preventing authorized access to an electronic communication while it is in electronic storage in such a system. 18 U.S.C. § 2701(a). Plaintiff's SCA claim fails as a matter of law because it does not plausibly allege that Morrow's

authorization was restricted or revoked and it does not identify an electronic communication service or facility. As discussed in section III(A), above, the Complaint lacks specificity as to instances of post-termination computer access and identifies no date on which any such access occurred.

The SCA claim is deficient because Plaintiff does not claim that they disabled Morrow's credentials or took any other steps to make any system off limits to Morrow. An email account cannot be accessed and an email sent, unless the account remains active and the user's login credentials are accepted by the system. Every email Morrow allegedly sent by using his authorized credentials to log into a company account is proof that no access restrictions existed. Compl., ¶ 41. Plaintiff cannot invoke the SCA to characterize as unauthorized the very access its own inaction continues to permit. Under *Van Buren*, 593 U.S. 374 (2021), and *United States v. Eddings*, 161 F. 4th 199 (3d Cir. 2025), authorization continues until affirmatively revoked. Plaintiff has not plausibly alleged that Morrow accessed any system without authorization or in excess of his authorization.

Further, the SCA applies only to unauthorized access to a qualifying "facility through which an electronic communication service is provided," 18 U.S.C. § 2701(a), and excludes access to information on the user's own device or in ordinary business systems not functioning as such a facility. *See Garcia v. City of Laredo*, 702 F.3d 788, 792–93 (5th Cir. 2012)(citation omitted)(stating that SCA is designed to protect "facilities that are *operated by* electronic communication service providers and used to store and maintain electronic storage"). Plaintiff does not specify where any alleged communications were stored, by what provider, and why they qualify as communications held in backup storage by an electronic communication service rather than ordinary data sitting on a company's own systems.

10

Lastly, Plaintiff does not allege that the Company itself is an electronic communication service provider. Instead, Plaintiff makes only a vague, general allegation that "[t]he Company's email systems, collaboration platforms, and cloud storage contain electronic communications in electronic storage on facilities through which electronic communication services are provided." Compl., ¶ 78. Plaintiff does not identify any electronic communication service providers such as Google, Yahoo, or Microsoft. *Cf. Broidy v. Global Risk Advisors LLC*, 2023 WL 6258135, at *9 (S.D.N.Y. Sept. 26, 2023)(SCA claims sufficient where complaint identified service providers as Google and Gmail). Plaintiff cannot save its claim by parroting the language of the statute where it has failed to allege unauthorized access, a qualifying facility, and an electronic communication service provider with factual specificity. *See Iqbal*, 556 U.S. at 681.

**C.  Plaintiff fails to state a claim for violation of the DTSA (Count V)**

To state a claim under the DTSA, plaintiff must plausibly allege the existence of a protectable trade secret, meaning information that "(A) the owner thereof has taken reasonable measures to keep secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person." 18 U.S.C. § 1839(3). A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Cashman Dredging and Marine Contracting Co., LLC v. Belesimo*, 759 F. Supp. 3d 120, 139 (D. Mass. 2024)(citation omitted). "A plaintiff's description of its alleged trade secrets 'must be made with clarity that can be understood by a lay person . . . and distinguish what is protectable from that which is not.'" *Id.* (citation omitted).

Plaintiff does not identify any supposed trade secrets with specificity. *See Cashman Dredging*, 759 F. Supp. 3d at 140 (holding plaintiff's description of trade secrets as a market

11

study, specifications, IHC designs and bid estimates insufficient to qualify as bona fide trade secrets); *Sutra, Inc. v. Iceland Exp., ehf*, No. 04-11360, 2008 WL 2705580, at *4 (D. Mass. July 10, 2008)(description of trade secret as operation, appearance, features and functionality of interfaces and modules "far too open textured to meet the test for an identifiable trade secret"). Plaintiff broadly defines the trade secrets as "[t]he Company's records, including its electronic communication systems, financial records, employment agreements, board materials, and key vendor relationships." Compl., ¶ 83. But this definition includes information that is, by law, publicly available. Plaintiff is a publicly traded company (Compl., ¶ 8) and is, therefore, required to disclose financial records and certain Board-related materials to the public. That information, which Plaintiff admits is filed publicly on EDGAR and SEDAR, cannot constitute a trade secret because it lacks the essential element of secrecy. Plaintiff makes no attempt to distinguish between the publicly disclosed records and any purportedly confidential ones, leaving the Court with no basis to identify what, if anything, qualifies for trade secret protection.

Plaintiff's DTSA claim also fails because Plaintiff does not allege that it took reasonable measures to protect any alleged trade secret. In evaluating whether a party took reasonable steps to protect the secrecy of the claimed trade secret, the Court considers factors such as: (1) any express agreement restricting disclosure, (2) any security precautions taken to prevent unauthorized acquisition of the information, (3) the circumstances of disclosure to the employee suggesting that further disclosure is prohibited, and (4) the degree to which the information is publicly available or reasonably ascertainable. *Neural Magic, Inc. v. Meta Platforms, Inc.*, 659 F. Supp. 3d 138, 172 (D. Mass. 2023). Plaintiff does not allege that the Company took any action to protect the alleged trade secrets by restricting access, making confidentiality designations, implementing employee training, or implementing or enforcing nondisclosure agreements. *Cf.*

*Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 188–89 (1st Cir. 2023)(holding that employee agreements with confidentiality provisions, company's restriction of availability through use of passwords, and revocation of access upon termination sufficiently demonstrated reasonable protective steps). A company that fails to revoke or restrict access to its own systems cannot claim that it took reasonable measures to protect information.

Plaintiff claims that the supposed trade secrets were misappropriated "willfully and maliciously" but makes no attempt to distinguish what information was already known to Morrow as CEO from what information Morrow purportedly acquired through improper means. Compl., ¶ 85. Plaintiff does not identify what alleged trade secrets were used, when they were used, who they were supposedly disclosed to, or how they derive independent economic value from not being generally known. Again, reciting the elements of a claim without sufficient factual allegations does not suffice. *See Garvey v. Face of Beauty LLC*, 634 F. Supp. 3d 84, 96 (S.D.N.Y. 2022)(citation omitted)(holding that complaint must allege sufficient information about a trade secret's "nature, value and measures taken to safeguard it to support an inference that it qualifies as a trade secret").

## IV.    PLAINTIFF'S STATE LAW CLAIMS (COUNTS VI-XI) SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

Should this Court dismiss Plaintiff's federal claims, it should decline to exercise supplemental jurisdiction over the remaining state law claims. Where all federal claims are dismissed, courts routinely decline to exercise supplemental jurisdiction over the remaining state claims. *See Langone v. N&D Transp. Co., Inc.*, No. 14-11028, 2015 WL 13892152, at *4 (D. Mass. Aug. 27, 2015)(citation omitted)("the balance of competing factors ordinarily will weigh strongly in favor of declining jurisdiction over state law claims where the foundational federal claims have been dismissed at an early stage in the litigation"). To the extent this Court chooses

to exercise supplemental jurisdiction, the state law claims should be dismissed for the reasons set forth below.

### A. Plaintiff fails to state a claim for conversion (Count VI)

"The elements of conversion may be established by a showing that one person exercised dominion over the personal property of another, without right, and thereby deprived the rightful owner of its use and enjoyment." *In re Hilson*, 448 Mass. 603, 611 (2007). Here, whether Morrow acted "without right" depends entirely on whether the new Board was validly constituted and had authority to demand return of property. By acknowledging the pending litigation challenging the validity of the new Board, Plaintiff admits that the Board's authority is not an established fact but an unresolved legal question. Compl., ¶ 55.

A complaint that contradicts itself or its exhibits "may cancel [itself] out and render the claim subject to dismissal." *BioChemics, Inc. v. AXIS Reinsurance Co.*, 924 F.3d 633, 644 (1st Cir. 2019)(rejecting argument stemming from inconsistently pled claim)(citations omitted). Plaintiff cannot have it both ways by acknowledging in one statement that the new Board's authority is being litigated in the Cayman Islands, and in another ask this Court to assume that authority is valid for purposes of bringing a tort claim. Contradictory allegations "are inherently implausible, and fail to comply with Rule 8, Twombly, and Iqbal." *Marchioli v. Pre-employ.com, Inc.*, No. CV171566JGBDTBX, 2017 WL 8186761, at *19 (C.D. Cal. June 30, 2017)(citation omitted). Morrow's refusal to surrender property he rightfully possessed to a board whose authority is the subject of an ongoing corporate governance dispute is not a plausible allegation of conversion and should be dismissed.

### B. Plaintiff fails to state a claim for civil conspiracy (Count VII)

To state a claim for civil conspiracy, Plaintiff must allege either that the defendants combined in a way that gave them unusual power they would not have had acting alone or that

14

they worked together under a common plan to commit a wrongful act. *Greene v. Philip Morris USA Inc.*, 491 Mass. 866, 871 (2023)(citation omitted). Plaintiff has not plausibly pleaded either theory.

Plaintiff identifies Michael Smith ("Smith") as the alleged co-conspirator but provides no detail about Smith beyond his name and title. Compl., ¶ 61. Plaintiff claims that Morrow and Smith "entered into an agreement or tacit understanding to engage in unlawful acts." Compl., ¶ 92. That bald statement is nothing more than a recitation of the legal standard for civil conspiracy dressed up as a fact. *See Iqbal*, 556 U.S. 662, 678, 681 (2009)(citation omitted)("formulaic recitation of the elements" of a statutory discrimination claim were "conclusory and not entitled to be assumed true"). Plaintiff attributes no specific act to Smith, describes no communication or meeting between Smith and Morrow, identifies no role Smith played in any alleged scheme, and does not explain what Smith allegedly agreed to do or actually did in furtherance of any plan. *See Stroman v. Spence*, 2009 WL 10873183, at *2 (D. Mass. Aug. 20, 2009)(dismissing complaint that "lack[ed] any facts regarding the existence or scope" of a conspiracy). Without any factual allegations describing what Smith allegedly did, agreed to, or planned, the conspiracy claim is nothing more than a legal conclusion that must be dismissed. *Id.* at *2, *citing Watterson v. Page*, 987 F.2d 1, 9 n.7 (1st Cir. 1993)("mere conclusory allegations that defendants 'conspired' are not enough").

### C. Plaintiff fails to state a claim for tortious interference with contract (Count VIII)

To state a claim for tortious interference with contractual relations, the plaintiff must allege that (1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions. *Conformis, Inc. v.*

15

*Aetna, Inc.*, 58 F.4th 517, 537-38 (1st Cir. 2023). Massachusetts courts will find the improper motive element met when defendant exhibits "actual malice or a spiteful, malignant purpose, unrelated to [a] legitimate corporate interest." *Hamann v. Carpenter*, 937 F.3d 86, 90 (1st Cir. 2019)(quotation and citation omitted). "Action to advance one's own economic interest, without more, does not amount to improper motive." *CMTA, Inc. v. Dussault*, No. 25-cv-10490, 2026 WL 323357, at *5 (D. Mass. Feb. 6, 2026).

Plaintiff alleges the existence of two contracts (one with the operator of the Scully Mine and one with the Company's outside auditor) but fails to provide any details about those contracts and plausibly plead the remaining elements of the claim. To establish tortious interference, a "plaintiff must furnish enough detail about the obligations of the alleged contracts to allow a reasoned determination as to whether the second element—breach of contract—is alleged." *Conformis, Inc.*, 58 F.4th at 538. Plaintiff does not identify any alleged contractual terms, obligations, performance requirements, or conditions Morrow purportedly caused any party to breach. Plaintiff also fails to allege improper motive or means with specificity. *See CMTA, Inc.*, WL 323357, at *6 (dismissing tortious interference claim because plaintiff failed to plausibly allege defendant acted with intent to induce break in contractual relationship). Plaintiff asserts that Morrow "falsely represent[ed] that he retained authority," but the Complaint acknowledges the corporate governance dispute which is fundamentally inconsistent with a spiteful or malignant purpose unrelated to a legitimate corporate interest.[4] Compl., ¶¶ 55, 98.

---

[4] Plaintiff alleges that Morrow contacted the Scully Mine operator on December 13, 2025 and signed the Notice of Default as a director of 1128349 B.C. Ltd. on January 27, 2026. Compl., ¶¶ 46-47. At those times, Morrow was the Plaintiff's CEO and a director of the subsidiary.

### D.  Plaintiff fails to state a claim for intentional interference (Count IX)

A claim for intentional interference with an advantageous business relationship requires that "the plaintiff had an advantageous business relationship with a third party, the defendant knowingly induced a breaking of the relationship, and the defendant's interference was improper in motive or means, causing the plaintiff harm." *Comeau v. Town of Webster*, 881 F. Supp. 2d 177, 190 (D. Mass. 2012). The plaintiff must "show a probable future business relationship from which there is a reasonable expectancy of financial benefit." *Id.* Here, Plaintiff does not identify any specific probable future business relationships. Plaintiff identifies the Scully Mine, with which it has a current contractual relationship, and the Company's outside auditors who confer no financial benefit upon the Company. Compl., ¶ 102.

Plaintiff fails to plausibly plead that Morrow's conduct was motivated by malice or used wrongful means. *See Comeau*, 881 F. Supp. 2d at 190 (citation omitted)(requiring proof of "a spiteful, malignant purpose, unrelated to the legitimate corporate interest"). A CEO who communicated with the Company's contractual counterparties regarding operational matters during a contested change of control cannot plausibly support a claim for malice or independently wrongful means. *Id.* at 191 (holding that actual malice requires purely personal motives or acts unconnected to the company's interests). Moreover, where the intentional interference claim merely restates the elements of tortious interference without identifying any distinct prospective relationship, it is duplicative and adds nothing. *Oliver Wyman, Inc. v. Eielson*, No. 15 Civ. 5305, 2016 WL 5339549, at * 11 (S.D.N.Y. Sept. 22, 2016). The intentional interference claim should be dismissed for failure to state a claim.

### E.  Plaintiff fails to state a claim for breach of duty of loyalty (Count X)

Plaintiff pleads three specific acts as breaches of the duty of loyalty: (1) misappropriating confidential information to divert business opportunities; (2) causing the Scully Mine to make

royalty payments to an account controlled by Morrow; and (3) receiving a transfer of the Ordinary B share of Merkanti Malta for inadequate consideration. Compl., ¶ 109. None of these acts plausibly support a claim that Morrow breached his duty of loyalty.

First, the conclusory misappropriation allegation fails to meet the pleading standards. *Iqbal*, 556 U.S. at 681. Plaintiff does not identify what confidential information was used and what business opportunity was diverted. Regarding the Scully Mine royalty payment, while Plaintiff claims that Morrow "controls" the account, it does not plausibly plead that the account was opened or used for anything other than a legitimate corporate purpose. Compl., ¶ 46. Further, Plaintiff contends that the payment request was made without any direction from the Board, but the authority of the new Board is contested.

Plaintiff alleges that Morrow received a "self-interested transfer" of one Ordinary B share from a subsidiary.[5] Compl., ¶ 50. However, Plaintiff does not allege that the transfer was unauthorized or in violation of the subsidiary's governing documents. As Plaintiff acknowledges, the share at issue "vests in the holder the right to approve certain governance matters." Compl., ¶ 49. Plaintiff cannot plausibly allege that the share was transferred improperly while simultaneously admitting that the share is a well-recognized corporate mechanism designed to protect the company from corporate takeovers. The nature of the share, as described by Plaintiff, is at odds with such an inference. This inconsistent, conclusory characterization of an authorized transfer as a breach of loyalty, without facts plausibly establishing that Morrow somehow circumvented proper authorization, coerced or deceived the subsidiary, or obtained the share by other improper means, cannot support a claim for breach of loyalty. *See Schaer v. Brandeis Univ.*,

---

[5] This factual allegation relates solely to Merkanti Malta, a subsidiary of the Company that is not a named plaintiff in this action.

432 Mass. 474, 478 (2000)("we do not accept legal conclusions cast in the form of factual allegations"); *see also Iqbal*, 556 U.S. at 681 ("the conclusory nature of respondent's allegations . . . disentitle them to the presumption of truth").

### F.  Plaintiff fails to state a claim for violation of the MUTSA (Count XI)

To succeed on a MUTSA misappropriation claim, a plaintiff must demonstrate "1) the existence of a trade secret; 2) reasonable steps taken by the plaintiff to preserve the secrecy of its trade secret; and 3) the defendant's use of improper means in breach of its confidential relationship with the plaintiff to acquire and use the trade secret." *Neural Magic, Inc.*, 659 F. Supp. 3d at 158 (citation omitted). Misappropriation requires either acquisition by improper means or disclosure or use without consent by a person who knew or had reason to know the secret was acquired in circumstances giving rise to a duty of secrecy. M.G.L. c. 93, § 42. The relevant provisions of the MUTSA mirror the DTSA and are evaluated under the same standard. *Sutra, Inc.*, 2008 WL 2705580, at 3. The MUTSA requires more than a recitation of elements; it requires identification of the specific information claimed as a trade secret and a plausible allegation that it satisfies the statutory definition. *See Neural Magic, Inc.*, 659 F. Supp. 3d at 166-67.

Plaintiff fails to identify the specific trade secret, identify why it derives independent economic value from secrecy, explain why it would not be ascertainable through proper means, or explain how it differs from ordinary confidential business information that does not qualify for statutory protection. Further, Plaintiff's misappropriation theory (Morrow "us[ed] such trade secrets without the express or implied consent of the Company, as managed by the [new] Board" (Compl., ¶ 113)) fails because Morrow acquired the information as a corporate officer. The MUTSA definition of misappropriation does not include continued possession or use of

information lawfully acquired through employment. *See* M.G.L. c. 93, § 42. Moreover, Plaintiff identifies no specific act of disclosure to a third party and no specific use of any identified trade secret for any purpose inconsistent with Morrow's authorized role. The allegation that Morrow "used" trade secrets without Board consent is a legal conclusion tied to the corporate governance issues. *See* Section I, above.

The MUTSA requires that the alleged trade secrets be "the subject of efforts that [are] reasonable under the circumstances" to maintain secrecy. M.G.L. c. 93, § 42. Plaintiff identifies no access controls, confidentiality protocols, restricted designations, or nondisclosure agreements specifically covering the information at issue. *See Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 841 (1972)("one seeking to prevent the disclosure or use of trade secrets or information must demonstrate that he pursued an active course of conduct designed to inform his employees that such secrets and information were to remain confidential"). To the contrary, the Complaint establishes that Plaintiff left Morrow with access to Company email accounts, cloud storage, financial systems, and regulatory filing credentials even after the Termination Date, and that the termination letter demanding return of Company property said nothing about protecting confidential information or restricting access to it. A company that takes no steps to restrict access to its own systems cannot plausibly allege that it treated the information on those systems as a trade secret. The MUTSA claim should therefore be dismissed.

### CONCLUSION

WHEREFORE, Defendant Samuel S. Morrow respectfully requests that the court grant his Motion to Dismiss Plaintiff Scully Royalty's Complaint in its entirety.

Respectfully submitted,

SAMUEL S. MORROW,

By his attorneys,

*/s/ Alan D. Rose, Jr.*
Alan D. Rose, Jr. (BBO #628871)
Sarajane Levien (BBO #716071)
ROSE LAW PARTNERS LLP
185 Dartmouth Street, Suite 602
Boston, MA 02116
617-536-0040 (Office)
617-536-4400 (Fax)
adrjr@rose-law.net
sjl@rose-law.net

Date: June 11, 2026

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system on June 11, 2026 will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Alan D. Rose, Jr.*
Alan D. Rose, Jr.